**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KENNETH FELD,

      Plaintiff,

      v.

FIREMAN'S FUND INSURANCE
COMPANY,

      Defendant.

Civil Action No. 12-1789 (JDB)

## MEMORANDUM OPINION

Defendant Fireman's Fund Insurance Company ("FFIC") refused to fully reimburse plaintiff Kenneth Feld for more than $4.5 million in legal fees and costs that Feld claims to have incurred in a separate, protracted legal battle. Before the Court now are the parties' cross-motions for summary judgment. While the bulk of the dispute will be resolved by granting FFIC summary judgment in part, a remaining quarrel over almost $200,000 in legal expenses means that this show must, unfortunately, go on.

## BACKGROUND

The facts of this case were summarized at length in the Court's previous opinion and hence only a limited recitation of the details is needed here—drawn largely from that prior opinion. See July 3, 2013 Mem. Op. [ECF No. 19] at 1–6. The origin of this dispute lies in another case from this district: Feld v. Feld, Civil Action No. 08-cv-1557-ESH. That was a highly contentious personal injury suit brought by Karen Feld (a non-party to the proceedings in this Court) against her older brother Kenneth Feld. At the time of the events alleged in Karen's complaint, Feld had personal liability insurance coverage under a "Prestige Home Premier" policy (the "Policy") issued

by FFIC.  The Policy provided that FFIC would defend Feld against covered claims or suits against him.  Under the Policy, FFIC had a duty to "[p]rovide a defense at [its] expense by counsel of [its] choice."  Policy, Ex. 1 to Def.'s Mot. for Summ. J. [ECF No. 68-1] at 55.

On June 12, 2009, Feld notified FFIC of the personal injury litigation ("the Underlying Action") and of his claim for coverage under the Policy.  See Pl.'s Stmt. of Undisputed Facts [ECF No. 73] ¶ 35.  FFIC agreed to defend Feld in the Underlying Action "subject to a full and complete reservation of rights."  Coverage Letter, Ex. 4 to Kirtland Decl. [ECF No. 72-4] at 1.  Specifically, FFIC stated that the claims in the Underlying Action alleged intentional conduct and hence were "not covered by the Policy."  Id.  FFIC nevertheless agreed to provide a defense because Feld had denied the allegations and said that he acted in self-defense.  Id.  FFIC told Feld:

> Subject to [FFIC's] reservation of rights, you may elect to choose your own counsel to defend you in this matter; otherwise we can appoint counsel for you.  FFIC agrees to pay, at an agreed hourly rate, the reasonable and necessary legal fees and Court costs incurred by counsel to defend you subsequent to the date this matter was tendered to FFIC under a full reservation of rights, and in accordance with the terms and conditions of the subject Policy and those contained herein.  Payment by FFIC for any legal expenses incurred on your behalf will not act as a waiver of any rights FFIC may have to adjust, allocate or assert that there is no coverage for any payment made.

Id.  Feld retained counsel from the law firm of Fulbright & Jaworski L.L.P. to represent him in the Underlying Action.  That litigation—culminating in a lengthy and highly publicized trial, followed by an appeal to the D.C. Circuit—not only generated much ill will within the Feld family, it also generated a legal bill for Kenneth Feld in excess of $4.5 million.  FFIC reimbursed Feld for a little more than $2 million of those fees.  Feld then filed this action to recover the difference, arguing that FFIC breached its insurance contract by refusing to cover the rest of his legal fees from the Underlying Action.

FFIC responded with a summary judgment motion claiming that it paid what it owed pursuant to the parties' agreement regarding the hourly rates to be charged by Feld's counsel. Feld says there was never any such agreement and FFIC owes him the "reasonable" legal fees promised in the Policy. So the $2-million-dollar question is: Was there an agreement as to rates?

## DISCUSSION

### I. <u>Legal Standard for Summary Judgment</u>

To obtain summary judgment, the moving party must show that there is no genuine dispute as to any material fact as to the claim at issue. The movant need not entirely foreclose the possibility that there could exist an issue of material fact, he need only show that the non-movant has failed, or by necessity will fail, to appropriately raise the issue. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In making this determination, a court must view the facts in the light most favorable to the non-movant and draw all justifiable inferences in his favor. <u>Id.</u> at 255.

### II. <u>Breach of Contract</u>

#### A. Late Notice

FFIC's opening act is to argue that it owes Feld nothing because he failed to timely notify FFIC of his claim as required by the Policy. Policy, Ex. 1 to Def.'s Mot. for Summ. J. at 99. FFIC's "late notice" defense runs smack into a choice of law issue. Under Maryland law, an insurer generally must provide coverage even in the event of late notice unless it can prove by a preponderance of the evidence that the untimely notice caused actual prejudice. <u>Minn. Lawyers Mut. Ins. Co. v. Baylor & Jackson, PLLC</u>, 531 F. App'x 312, 319–20 (4th Cir. 2013). In the

District of Columbia, however, "an insurer is not required to demonstrate actual prejudice before denying coverage on the basis of an insured's failure to comply with a contractual notice provision." Nat'l R.R. Passenger Corp. v. Lexington Ins. Co., 445 F. Supp. 2d 37, 43 (D.D.C. 2006), aff'd, 249 F. App'x 832 (D.C. Cir. 2007) (per curiam). "The starting point for assessing which state's law should apply is the law of the forum state." Aref v. Lynch, No. 15-5154, 2016 WL 4409356, at *13 (D.C. Cir. Aug. 19, 2016). Hence, the Court will look to D.C. choice-of-law principles.

D.C. employs the "governmental interest" test to determine which state's law to apply. Id. at *14. The test involves a two-step inquiry: identify the governmental policy underlying the applicable law and then determine which state's policy would be most advanced by having its law applied to the facts of the case. Id. For insurance contracts, there is a presumption that the governing law is the "local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship." Restatement (Second) of Conflict of Laws § 193 (1971); 21st Century N. Am. Ins. Co. v. Nationwide Gen. Ins. Co., No. 1:14-CV-00557 (AK), 2015 WL 1570154, at *2 (D.D.C. Apr. 9, 2015); see Indep. Petrochem. Corp. v. Aetna Cas. & Sur. Co., 944 F.2d 940, 948 (D.C. Cir. 1991) (applying § 193 to an insurance policy); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Binker, 665 F. Supp. 35, 40 (D.D.C. 1987). D.C. courts look at six factors to determine whether another state has "a more significant relationship": (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; (5) the residence and place of business of the parties; and (6) the principal location of the insured risk. Adolph Coors Co. v. Truck Ins. Exchange, 960 A.2d 617, 620 (D.C. 2008).

Here, the parties surely understood Maryland to be the principal location of the insured risk given that the homeowner's policy at issue provided coverage for Feld's Maryland domicile.  See Policy, Ex. 1 to Def.'s Mot. for Summ. J. at 16; see also Gray v. Grain Dealers Mut. Ins. Co., 871 F.2d 1128, 1130 (D.C. Cir. 1989) (finding that the state of the policyholder's residence was the intended principal location of the insured car); 21st Century N. Am. Ins. Co., 2015 WL 1570154, at *3 (same).  FFIC wants to parse the Policy into property coverage and personal liability, with D.C. then being the location of the risk for the personal liability portion of the contract.  Def.'s Mot. for Summ. J. [ECF No. 68] at 20.  FFIC, though, has cited no authority for this type of slicing and dicing of a homeowner's policy.  And even if the Court took that narrow view of the insured risk, the location of the risk would then not be entitled to any special weight because it would not be in a single state.  Restatement (Second) of Conflict of Laws § 193 cmt. b (1971).

Turning to the other Restatement factors, in its motion for summary judgment FFIC took the position that the factors did not favor any one jurisdiction.  Def.'s Mot. for Summ. J. at 20.  By the time FFIC filed its opposition brief, however, it had decided that in fact the most significant Restatement factors—primarily the place of performance of the contract—pointed to the District of Columbia.  Def.'s Opp'n [ECF No. 83] at 25.  But the fact that D.C. was the location of the underlying incident and lawsuit is entitled to little weight here.  It is generally understood that the location of an underlying injury does not play a significant role in a contractual suit.  See Holmes v. Brethren Mut. Ins. Co., 868 A.2d 155, 157 n.2 (D.C. 2005); Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 202 (D.C. 1997) ("The location of fortuitous events . . . generally is not considered a persuasive factor in choice of law analysis in situations of economic loss . . . .").  Nor is the place of performance considered significant when at the time of contracting it is either uncertain or unknown.  Restatement (Second) of Conflict of Laws § 188 cmt. e (1971).  Here, no

one could have known where performance would occur because the personal liability portion of the Policy covered suits brought "anywhere in the world." Policy, Ex. 1 to Def.'s Mot. for Summ. J. at 55. And again, the Court is not persuaded that the subject matter of this homeowner's policy should be considered the D.C.-based litigation rather than the home protected by the policy. See Chi. Ins. Co. v. Paulson & Nace, PLLC, 37 F. Supp. 3d 281, 291 (D.D.C. 2014) (holding that subject matter of professional liability insurance policy was the attorneys' professional activities, not the underlying lawsuit), aff'd, 783 F.3d 897, 902–03 (D.C. Cir. 2015). D.C. was not the place of contracting, the place of negotiation, or the residence of the parties.

Maryland, though, was one of the places of negotiation, Def.'s Mot. for Summ. J. at 20— a significant contact (although less so in a case like this one where there is no single place of negotiation), Restatement (Second) of Conflict of Laws § 188 cmt. e (1971). Moreover, the Policy indicates that Maryland law applies. Specifically, the Policy includes an amendment titled "Prestige Home Premier Amendatory Endorsement—Maryland." Policy, Ex. 1 to Def.'s Mot. for Summ. J. at 32. Policy language is of course indicative of the parties' intentions, see Vaughan, 702 A.2d at 201, and courts regularly look to these types of amendatory endorsements as probative of what law the parties expected would govern the contract, see Adolph Coors Co., 960 A.2d at 621; Kender v. Auto-Owners-Ins. Co., 793 N.W.2d 88, 94–95 (Wis. Ct. App. 2010); see also Gray, 871 F.2d at 1130 (noting policy provisions that specifically referred to North Carolina law). The amendatory endorsement in Feld's policy is just one of the Policy's several references to Maryland. See Policy, Ex. 1 to Def.'s Mot. for Summ. J. at 21–26 (Maryland specific form numbers in the lower left-hand corner).

"[T]he protection of the justified expectations of the parties is of considerable importance in contracts," Restatement (Second) of Conflict of Laws § 188 cmt. b (1971), which is why special

weight is given to the location of the insured risk in insurance contract cases. "[I]t can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract." Restatement (Second) of Conflict of Laws § 193 cmt. c (1971); accord Vaughan, 702 A.2d at 201. The home at the center of this homeowner's policy was in Maryland. And the Policy is full of indications that the parties, sensibly, expected Maryland law to govern the contract. D.C., on the other hand, was just incidentally the site of the incident. Upon contracting, the parties had no reason to expect D.C. law to govern a future dispute. For all these reasons, the Court concludes that Maryland law governs this contractual dispute concerning the obligations owed to Feld under his Policy. And under Maryland law, FFIC must show actual prejudice in order to prevail on the "late notice" issue. But it has not done so.

Although Feld did not notify FFIC of a claim until June 2009, see Liability Notice, Ex. 5 to Def.'s Mot. for Summ. J. [ECF No. 68-5] at 2—nearly two years after he first hired Fulbright to handle his sister's anticipated lawsuit, Def.'s Mot. for Summ. J. at 24—all that had happened in the Underlying Action by that time was Feld's filing of an answer and motion to dismiss. Hence, this case is nothing like Minnesota Lawyers Mutual Insurance Co. v. Baylor & Jackson, PLLC—cited by FFIC—where a judgment had already been entered and affirmed before the insurer received notice. 531 Fed. App'x at 320. And unlike that case, where the insurer explained how the insured's untimely notice had prevented it from advising the insured to file a motion for reconsideration, assisting in crafting arguments for that motion, or assisting with an appeal, id., here FFIC has offered no "palpable instances" of opportunities lost during Feld's delay, see Gen. Acc. Ins. Co. v. Scott, 107 Md. App. 603, 616 (1996). "[C]onclusory allegations about difficulties and inconveniences that would result from any delay in notification are not sufficient." Id. FFIC's

assertion that because of the delay it "lost significant rights under the Policy to investigate and settle the case or mitigate the potential claim before it was filed," Def.'s Reply [ECF No. 90] at 16, is just that type of unacceptably general and inexact assertion.   Hence, FFIC has not demonstrated the prejudice required to prevail on its late notice claim.   That conclusion admits us to the main event in this case—whether the rates that FFIC would pay for representation of Feld were set by prior agreement.

### B.  Rates Agreement

FFIC has a winning argument here: Feld agreed to the rates FFIC has paid and so cannot now be heard to demand more.  For an enforceable contract to exist there must be "both agreement as to all material terms[] and intention of the parties to be bound."  Duk Hea Oh v. Nat'l Capital Revitalization Corp., 7 A.3d 997, 1013 (D.C. 2010) (internal quotation marks omitted).[1]  "The determination whether an enforceable contract exists, when based on the contract documents, is a question of law . . . ."  Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 369 n.9 (D.C. 1990).  When the determination is based on oral representations, it is "likewise [a question] of law."  Id.  FFIC, as the party asserting the existence of a contract, bears the burden of proof.  See Jack Baker, Inc. v. Office Space Dev. Corp., 664 A.2d 1236, 1238 (D.C. 1995).

In assessing whether a contract exists, the Court applies an objective standard to the words or actions that allegedly gave rise to an agreement.  See Northland Capital Corp. v. Silver, 735 F.2d 1421, 1426–27 n.7 (D.C. Cir. 1984) ("The principle that objective manifestation of intent is controlling in contract formation is very well established.").  The intentions of parties to a contract

---

[1]  Because the law of contract formation is the same under D.C. and Maryland law, the Court relies on the law of the forum, i.e., D.C., for this Section.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 838 n.20 (1985) (defining "no conflict"); Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP, 68 A.3d 697, 714 (D.C. 2013) ("The absence of true conflict compels the application of District of Columbia law by default.").  The parties agree that there is no conflict of law with regards to contract formation here.  Pl.'s Opp'n [ECF No. 84] at 13; Def.'s Opp'n [ECF No. 83] at 4 & n.2.

can be found from written materials, oral expressions, and the actions of the parties.  Duffy v. Duffy, 881 A.2d 630, 636–37 (D.C. 2005).   Most relevant to deciding whether Feld entered into a binding agreement with FFIC regarding an "hourly rate" are a series of communications between FFIC Technical Director Charles Kirk and Fulbright attorney Caroline Mew between September and October of 2009.

During a phone call on September 16, 2009, Kirk told Mew the rates that FFIC would be willing to pay: $250/hour for partners, $200/hour for associates, and $95/hour for paralegals.  Pl.'s Opp'n [ECF No. 84] at 15; Mew Dep. [ECF No. 68-7] at 38:7–42:17.   (At the time, Fulbright was charging $500/hour for its partners' time.  Kirk's Claims History Caption Report, Ex. 9 to Kirtland Decl. [ECF No. 74-6] at 47.)  Feld emphasizes that Kirk "simply stated the maximum attorney rates that it would be willing to pay," Pl.'s Opp'n at 15—as if that settles the matter that no offer was extended.  He seems to assume a difference between a simple statement and a contractual offer, but in fact, the usual practice in reaching agreements is that one party "first announces what he will do and what he requires in exchange."  Restatement (Second) of Contracts § 22 cmt. a (1981).

When Mew and Kirk spoke again on October 4, 2009, Mew asked if FFIC could increase the rates.  Def.'s Stmt. of Undisputed Material Facts [ECF No. 68] ¶ 24.  Feld frames Mew's question to Kirk about rates as a "mere inquiry" not a counter-offer.  Pl.'s Opp'n at 15–16.  So let's assume that's all it is.  Mew inquires whether Kirk can increase the rates in his offer.  Kirk says he cannot increase the partner rate but that FFIC can go up to $225 and $100 for associates and paralegals respectively.  Def.'s Stmt. of Undisputed Material Facts ¶ 24.  At this point, then, Kirk has again announced what he requires in exchange for representation of Feld.  And according to Kirk's deposition, Mew agreed that would be the rate going forward.  Kirk Dep. [ECF No. 75]

at 195:23–24.  Feld has submitted no evidence to contest this version of the conversation.  Rather, he objects only to the characterization of Mew's inquiry as a "counter-proposal," relying on her deposition testimony that there could be no counterproposal from her given that there had never been a proposal from Kirk.  See Pl.'s Opp'n at 15–16.  Mew's characterization of the discussions, however, does not govern whether an offer was on the table on September 16 nor whether her follow-up constituted a counter-offer.  Contract formation is a question of law and depends on an objective assessment of the words and actions that allegedly gave rise to an agreement.

After the October 4 phone call, Kirk entered a claims history caption report: "Told [Mew] we need a report, and that I would send an email confirming rates, and attaching our current billing guidelines."  Pl.'s Mot. for Summ. J. [ECF No. 69] at 15 (quoting Kirk's Claims History Caption Report).  Kirk then sent an email to Mew that memorialized their phone call: "As insured selected counsel, we will agree to pay a rate not to exceed $250/hour for partners; $225/hour for associates; and $100/hour for paralegals."  E-mail from Kirk to Mew, Ex. 10 to Kirtland Decl. [ECF No. 72-10] at 2.  The email went on: "Any amount in excess of those rates would continue to be the insured's responsibility."  Id.  Feld points to this sentence as proof that no agreement had yet been reached.  Pl.'s Opp'n at 17.  That point, he says, is confirmed by Kirk's testimony that if there was no agreement on rates, the insured would have the option of paying the difference between the maximum rate that FFIC could pay and the rate the firm was insisting on.  Id.  Given this practice, Feld argues, Kirk's email to Mew—in insisting that Feld would be responsible for any amount in excess of the agreed rate—confirms the lack of an agreement on rates.  But in Kirk's view (and in hindsight), this language was just insurance against a later "misunderstanding or perceived waiver of our position on that subject."  Kirk Dep. at 194:11–12.  According to another FFIC employee, the sending of the billing guidelines is an indication that the parties have reached an agreement on

rates.  Sauter Dep. [ECF No. 76] at 275:8–15.  The Court admits that, while Kirk's email appears to memorialize an agreement reached in the October 4 phone call, there is room for a different interpretation.  But there is more that may illuminate the situation.

On October 28, Mew submitted a budget report to FFIC that used the rates of $250, $225, and $100.  See Proposed Budget, Ex. 11 to Kirtland Decl. [ECF No. 72-11] at 2–3.  The budget cover letter stated:

> This is a good faith estimate of the amount of time and expenses we anticipate expending in this case as of the present date. We do not consider this to be a binding representation of the fees and expenses that actually will be incurred in this matter. We ultimately will be guided by our professional judgment to use the time and resources necessary to zealously represent our client's interests.

Id. at 2.  Here, Feld highlights the middle sentence as proof that no agreement on rates has been reached.  Pl.'s Opp'n at 17–18.  According to Mew: "This is where we made our statement that we did not consider this budget to be a binding representation of our fees in this case." Mew Dep. at 61:12–15.  FFIC, though, took the letter to mean only "that the amount of time being estimated was just that, an estimate . . . the amount of hours could go up and down, just as the expenses would."  Kirk Dep. at 205:2–7.

Taking the cover letter as a whole, the Court does not think it can reasonably be read as a rejection of FFIC's proposed rates, which Fulbright went on to incorporate into the attached budget report.  Feld wants the cover letter's disclaimer to mean that he was neither bound by the estimated hours or the incorporated rate.  But that reading does not make sense in context.  The first sentence declares that the budget is only an estimate of the firm's "time and expenses."  The third sentence explains why this estimate could change: the firm will use "the time and resources [i.e., expenses] necessary to zealously represent" Feld.  In this context, the disclaimer as to "fees" only makes sense as a caveat that the attorneys' time is subject to change—not the rates.  FFIC argues that

even assuming Feld had not accepted its rates at any prior moment in the negotiations, Fulbright's submission of the budget report using FFIC's proposed rates is the clinching point of Feld's acceptance.  The Court agrees.

The undisputed facts establish that at the time of Feld's budget submission—at the latest—the parties had agreed to the reduced rates.  First, Kirk's statement in September of the maximum rate FFIC was willing to pay in exchange for Fulbright's representation—a statement that no one disputes—constitutes an offer.  Perhaps Mew's suggestion in their next conversation of slightly higher rates was a counter-offer that Kirk then accepted.  Then too, there would be a contract.  But even if she only inquired generally as to whether FFIC could go any higher, Kirk's response as to FFIC's best offer became the deal on the table—a deal that he says she accepted, thus again creating a contract.  And even if there were contradictory evidence (which there is not) as to what was said in that October 4 phone call, Fulbright's submission of a budget incorporating the rates proposed by FFIC (and re-proposed in Kirk's email) would by itself be an acceptance of the offer, thereby cementing a contract.  Restatement (Second) of Contracts § 19 cmt. a (1981) ("Words are not the only medium of expression.  Conduct may often convey as clearly as words a promise or an assent to a proposed promise.").

Both parties proffer later conduct as further evidence of an intention to be bound or not.  "To be sure, actions taken after an alleged agreement is reached are relevant to assessing a party's intent to be bound . . . ." Blackstone v. Brink, 63 F. Supp. 3d 68, 83 (D.D.C. 2014); see Steven R. Perles, P.C., v. Kagy, 473 F.3d 1244, 1249 (D.C. Cir. 2007) ("Another factor in determining intent to be bound is the parties' conduct after they reach an alleged oral agreement.").  But no amount of "buyer's remorse" can "vitiate a demonstrated initial intent to be bound." Blackstone, 63 F. Supp. 3d at 83.

12

In support of the existence of an agreement, FFIC points to a November 18, 2009, letter from its outside counsel to Fulbright, which stated that FFIC had agreed on August 11, 2009 "to pay, at an agreed hourly rate, the reasonable and necessary legal fees," and that the parties had since "agreed on specific hourly rates for the defense of Feld."  Letter from Lindemann to Mew, Ex. 7 to Kirtland Decl. [ECF No. 72-7] at 2–3.

Feld presents its own letter, sent December 8, 2009, as evidence of lack of agreement. There, in response to an FFIC proposal of additional terms, Fulbright wrote:

> [W]e do not accept the proposal that any disagreements with FFIC regarding deductions or failure to pay the Firm's invoices must be appealed within 30 days.  Please be advised that we hereby expressly reject FFIC's position that "If no appeal is requested within the thirty (30) day time period, it will be deemed that your firm has acquiesced to all deductions or declinations."  Silence should not be presumed to be acquiescence or agreement by either Mr. Feld or the Firm.  To simplify matters, FFIC may presume that the Firm and Mr. Feld contest any and all amounts unpaid by FFIC on any bills presented by the Firm to FFIC for payment unless FFIC is notified otherwise.

Letter from Joiner to Lindemann, Ex. 12 to Kirtland Decl. [ECF No. 72-12] at 2 (emphasis omitted).  This, says Feld, shows that he reserved all rights to contest unpaid amounts.  Again, though, the context belies this broad interpretation.  The reservation of rights was in the context of rejecting a particular procedure for contesting deductions.  There is no reason to read this isolated paragraph as proof that the parties had not agreed on any terms.  In fact, the same letter arguably reflects the parties' mutual understanding about hourly rates:

> FFIC is currently paying only a fraction of the Firm's hourly rates with the remaining amounts being charged to Mr. Feld notwithstanding the insurance he has purchased from FFIC.  To further attempt to restrict the type of work done or to reduce the hours worked, which the Firm considers necessary for the defense, is inappropriate.

Id. at 2–3.

The final evidence to consider is Fulbright's invoices. FFIC relies heavily on the first invoice, submitted in August 2010, for services performed by Fulbright in the Underlying Action from 2007 through December 30, 2009. See Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts [ECF No. 85] at 27. The invoice totaled $786,789.81, id., using Fulbright's normal $500/hour rate, but FFIC sent a check for only $380,296.99, declaring on the face of the check that it was for "Legal fees through 12/31/09 at $250 partner/$225 associate as agreed," Check, Ex. 19 to Def.'s Mot. for Summ. J. [ECF No. 68-19] at 2. There is no dispute that Fulbright deposited the check. Pl.'s Resp. to Def.'s Stmt. of Undisputed Facts at 29; Def.'s Mot. for Summ. J. at 15; Compl. [ECF No. 1] ¶ 60 (Feld "proceeded . . . to accept partial reimbursement from FFIC . . . .").

The import of this dealing is a mixed bag. The submission of an invoice for fees based on Fulbright's usual going rate is not consistent with an agreement to a lower rate. On the other hand, the firm's acceptance of FFIC's reduced check (without complaint) comports with there being an agreement. See Lande v. Radiology Specialists of Kingston P.C., 806 F. Supp. 1084, 1089 (S.D.N.Y. 1992) (finding that party's "acceptance, endorsement and negotiation of the check . . . without protest or reservation, established his assent to the deal." (footnote omitted)); Hurt v. Rice, 521 N.E. 2d 751, 755 (Mass. App. Ct. 1988); cf. Restatement (Second) of Contracts § 281 cmt. d (illustrating that by indorsing and depositing a check, party "is bound by an accord under which he promises to accept payment of the check as satisfaction"). Then again, for every reduced check that followed, Feld contested the amount and submitted an appeal to FFIC.

There is no question that these parties have long been in a pre-litigation posture. There is much on which they have never agreed and likely much that they always anticipated litigating. Maybe Feld had hoped to walk the tightrope deftly enough to preserve the question of attorney rates for post-trial litigation. But the Court finds there was an intent be bound on rates as of

14

October 28, at the latest.  And to the extent these post-contract communications are relevant to the issue of contract formation, the parties' conduct is consistent with the existence of an agreement. The November letter from FFIC's outside counsel to Fulbright described an agreement on rates. And FFIC paid Feld's first invoice consistent with the rates FFIC says were agreed to. Fulbright, for its part, at least implied in its December letter that Feld had already compromised by accepting FFIC's limitations on attorney rates.  Depositing the first check, which was based on the allegedly agreed to rates, further tips the scales in favor of finding an agreement as to those rates.

Having found an offer and acceptance, the Court turns briefly to the question of consideration—an issue raised in passing by Feld, who argues that "no contract could have formed between Fulbright and FFIC for lack of consideration given that all FFIC stated it would do was pay what it considered to be the amounts it already was obligated to pay under the Policy as reasonable and necessary defense costs."  Pl.'s Mot. for Summ. J. at 21.  This premise is flawed in several ways.  First, FFIC clearly did not consider itself obligated to defend Feld under the Policy: "[The claims alleged by Karen Feld] are not covered by the Policy."  Coverage Letter, Ex. 4 to Kirtland Decl. at 9.  Second, courts are strongly cautioned against relying on this "preexisting duty rule" in formulating their decisions since the rule has fallen out of favor in modern times.  Johnson v. Seacor Marine Corp., 404 F.3d 871, 875 (5th Cir. 2005).  And in any event, the Court finds that there was consideration here because FFIC allowed Feld to choose his own counsel.  The Policy only guaranteed a defense at FFIC's expense by counsel of FFIC's choice or from FFIC's list of vendors.[2]

---

[2]  Feld seems to think that FFIC was already obligated to provide independent counsel due to a conflict of interest.  He asserts that, under Maryland law, an insurer must provide independent counsel when "the insurer has created a conflict of interest by denying coverage, and agreed to defend under a reservation of rights."  Pl.'s Opp'n at 24.  But "Maryland law is clear that an actual conflict of interest does not exist merely because an insurer defends its insured subject to a reservation of rights."  Driggs Corp. v. Pa. Mfrs. Ass'n Ins. Co., No. 98-2140, 1999 WL 305044, at *6 (4th Cir. May 14, 1999) (per curiam).  Further, the conflict highlighted by Feld—between FFIC's position that intentional torts are not covered by the Policy and Feld's assertion of self defense—does not strike the Court as a

Feld's last line of defense is that he should not be bound by any agreement made by his attorneys at Fulbright.   A client, however, is generally bound by his lawyer's acts in dealings with third persons, including the lawyer's assent to a contract.  Restatement (Third) of Law Governing Lawyers §§ 26–27 (2000).  Fulbright's authority to act on behalf of Feld is confirmed by Feld's deposition, where he stated that he expressly authorized Fulbright to deal with FFIC on his behalf and that any communication between Fulbright and FFIC about the rates "was a function of what [he] agreed with."  Feld Dep. [ECF No. 83-2] at 48:1–8.  Feld, nonetheless, seeks to avoid the general rule that a client is bound by a lawyer's acts by pointing to Kirk's deposition statement that Feld was not a party to any agreement about rates.  Whether Kirk understood Feld to be a party to the agreement does not change the fact that Feld, as the principal in the attorney-client relationship, was bound by any agreement his attorney entered.  See Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley, 999 F. Supp. 34, 49 (D.D.C. 1998) ("[A]n undisclosed principal may sue and be sued on a contract made by his agent." (internal quotation marks omitted)).

When the full history of the dealings between Feld (or Fulbright on his behalf) and FFIC is examined, it would take a contortionist to twist the facts to support the absence of a rate agreement.  Because Feld accepted FFIC's offer on attorney's fees hourly rates, his breach of contract action fails as to the $2,224,121.61 "attributable solely to the parties' dispute as to attorney rates."  See Pl.'s Reply [ECF No. 89] at 20 n.20.

---

conflict of interest at all.  As explained by FFIC, if Karen had defeated Feld's self-defense claim and recovered on her intentional tort counts, FFIC would have owed no coverage because of the Policy's exclusion of intentional torts. Similarly, if Feld had prevailed at trial on his self-defense claim, FFIC also would owe no indemnity obligation.  This situation is entirely distinguishable from the common conflict-of-interest case where the insured raises both covered and uncovered claims in a suit, thereby putting the insurer in the possible position of preferring the insured to lose on one theory of the case versus the other.  See Roussos v. Allstate Ins., 655 A.2d 40, 44 (Md. Ct. Spec. App. 1995).

III. **Expenses**

Leaving no dollar uncontested, Feld's complaint also seeks reimbursement for almost $200,000 in expenses that FFIC declined to reimburse on the ground that they were unreasonable.[3] FFIC had agreed to pay for the reasonable costs of Feld's defense. Coverage Letter, Ex. 4 to Kirtland Decl. at 10; Letter from Lindemann to Mew, Ex. 7 to Kirtland Decl. at 1–2; cf. Ceres Envtl. Servs. v. Arch Specialty Ins., 853 F. Supp. 2d 859, 863 (D. Minn. 2012) ("[T]he duty to defend extends only to reasonable costs . . . ."). After reviewing Feld's submitted invoices, the insurance company determined that certain expenses—ranging from postage to online legal research—did not qualify as reasonable, and therefore would not be reimbursed. For example, FFIC did not reimburse Feld for 2% of the hours claimed, including hours billed by Kirtland to attend three days of a trial in a separate litigation. See Def.'s Opp'n at 21; Pl.'s Opp'n at 24 (noting that FFIC found 98% of the time incurred was reasonable). Feld's expert says all Fulbright's legal expenses were reasonable. Jeffress Expert Report [ECF No. 70] at 7. FFIC's expert, no surprise, says they were not. Heinze Expert Report [ECF No. 80] at 14–17. Then there is John M. Simpson, a Fulbright attorney who has submitted a declaration in support of the reasonableness of the unreimbursed costs, see Simpson Decl. [ECF No. 71], which FFIC moves to strike in part as inadmissible expert testimony. It is to that issue that the Court turns first.

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. FFIC moves to strike 13 paragraphs of Simpson's 106-paragraph declaration because, in its view, the contents are

---

[3] Although this disputed amount is addressed under the label "expenses," it actually includes some attorney and paralegal time (i.e., "fees"), but only as to the reasonableness of the time expended, not the rates charged.

based on specialized knowledge, namely Simpson's 37 years of practice in complex federal court litigation.   Def.'s Mot. to Strike [ECF No. 81] at 3–6.   But the only paragraphs relevant here are paragraphs 94–100, addressing the reasonableness of the hours expended on the litigation, and paragraph 104, addressing the reasonableness of expenses.   Because these portions of Simpson's declaration are not based on Simpson's "previous professional experience," United States v. Smith, 640 F.3d 358, 365 (D.C. Cir. 2011), the motion to strike these paragraphs will be denied.[4]   See United States v. TDC Mgm't Corp., No. 15-5030, 2016 WL 3648551, at *5 (D.C. Cir. July 8, 2016) (finding no abuse of discretion in district court relying on a declaration "for some factual analyses" and disregarding "legal conclusions and other deficiencies").

Simpson's position that the number of hours expended was reasonable was based on contemporaneous time records and his personal knowledge of the case, as a participant in the litigation and trial.   Simpson Decl. ¶ 94.   His explanation that certain unreimbursed expenses were reasonable is similarly based on his involvement in the Underlying Action.   See id. ¶ 104 (explaining how the amount of legal research was reasonable and necessary given the number of legal issues presented by the Underlying Action).   Where he is relying on his personal knowledge of events, Simpson should be considered a lay witness and his opinions may be considered by the Court.   See United States v. Williams, No. 13-3019, 2016 WL 3648552, at *14 (D.C. Cir. July 8, 2016).   Indeed, courts regularly consider the lay testimony of the lawyers "who did the work for which the attorneys' fee petition was submitted."   Palmer v. Rice, No. CIV.A. 761439HHKJMF, 2005 WL 1278262, at *1 (D.D.C. May 27, 2005) (internal quotation marks and brackets omitted);

---

[4] FFIC objected that certain testimony offered by Simpson, which was based on his years of practice in complex federal court litigation, was inadmissible because Simpson had not been disclosed under Rule 26(a) as an expert witness.   Because those portions of the declaration are not relevant to the expenses issue, the motion as to those paragraphs will be denied as moot.   See Simpson Decl. [ECF No. 71] ¶¶ 91–94 (addressing the reasonableness of Fulbright's rates); id. ¶¶ 101–02 (addressing the reasonableness of Fulbright's overall fee).

see Minn. Lawyers Mut. Ins. Co. v. Batzli, 442 F. App'x 40, 54 (4th Cir. 2011); In re Holocaust

Victim Assets Litig., 270 F. Supp. 2d 313, 316 (E.D.N.Y. 2002).

So what do the varying views of Jeffress, Heinze, and Simpson establish?  Only that there

is a dispute as to the reasonableness of the contested expenses—whatever those expenses might

be.  But the issue is not fully fleshed out.  The Court cannot even pin down precisely what amount

is at stake.  Putting aside the hourly rate question, Feld's complaint claims that $194,694.78 in fees

and expenses are still in dispute.[5]  Compl. ¶ 50.

> These include, but are not limited to: online legal research expenses;
> internal photocopying charges billed at $0.15 per page (FFIC has
> paid $0.10 per page); charges billed by law firm timekeepers for
> tasks which FFIC deems as administrative or overhead; charges for
> tasks that FFIC deems to be temporary clerical or administrative
> help; charges for tasks that FFIC deems to be customarily performed
> by paralegals in insurance defense work; attendance by certain
> attorneys at Court conferences, depositions, and witness interviews;
> local travel expenses for attendance at Court conferences,
> depositions, and witness interviews; and attorney time incurred in
> order to comply with FFIC's billing and appeal procedures.

Id.  According to Feld's reply brief, though, the amount in dispute is only $101,247.63.  Pl.'s Reply

at 20 n.20.  Given this foundational discrepancy, it is perhaps predictable that the evidence as to

the reasonableness of these expenditures is not particularly specific.  FFIC's expert opines on

several unreasonable expenses, but those instances by themselves well exceed the amount that Feld

thinks is in dispute.  Heinze Expert Report at 15–17 (noting $70,561.00, $17,808.50, $63,869.50,

and $110,865.53 as examples of unreasonable costs).  Perhaps these costs were paid in part, leaving

some reduced amount in dispute, but who knows?  Feld's expert flat-out refuses to "make

judgments about the reasonableness of the time spent on any particular task"—calling the effort a

"herculean job."  Jeffress Expert Report at 8.

---

[5] It is not clear what rates Feld is relying on to arrive at this figure.

Simpson adds slightly more detail to support the reasonableness of the costs. He claims, for example, that Fulbright's charges for use of Lexis, WestLaw, and other on-line research databases, to the tune of $90,333.21, was "reasonable and necessary . . . given the number of legal issues presented by the Underlying Action," including "an issue of first impression" that "was a focus of the D.C. Circuit appeal." Simpson Decl. ¶ 104; see also Expenses Spreadsheet, Ex. 9 to Simpson Decl. [ECF No. 71-20]. (It is strange, then, that the D.C. Circuit found the merits of the appeal "easily rejected" "in only a sentence or two." Feld v. Feld, 688 F.3d 779, 781 (D.C. Cir. 2012).) While Simpson gives this one example of where $90,000 of research went, that is about all the Court knows about this category of disputed expenses—making it rather difficult to decide whether those expenditures were reasonable. Simpson also claims that the number of hours expended was reasonable based in part on the necessary subpoenas and depositions of Karen's medical providers. Simpson Decl. ¶ 98. (So necessary, it seems, that the judge in the Underlying Action called everything in the case "cumulative" and refused to even consider Feld's "375 pages of medical records." Def.'s Opp'n at 22 (internal quotation marks omitted).) The Court, however, cannot find any suggestion that these hours spent on the subpoenas and depositions are among the 2% of hours contested.

Clearly, this is not a record on which the Court can decide the parties' summary judgment motions as to the $200,000 expenses claim. All that is certain is that a question exists as to whether the expenses charged by Fulbright were reasonable—a matter that perhaps can only be resolved at trial. See Safeco Ins. Co. of Am. v. Chiang, No. C-04-1977 SC, 2006 WL 1867718, at *4 (N.D. Cal. July 6, 2006), amended, No. C-04-1977-SC, 2007 WL 460844 (N.D. Cal. Feb. 7, 2007) (holding that there was genuine issue of material fact as to whether the costs in dispute were reasonable under the contract); Feldman v. Talon Paint Prods., Inc., No. 01 CIV. 5657 (DC), 2002

WL 31385826, at *7 (S.D.N.Y. Oct. 22, 2002) ("The reasonableness of the fees is a matter that can only be resolved at trial."); see also Friends For All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 828 (D.C. Cir. 1984) ("[I]t is the jury's duty to determine the reasonable cost of [medical] examinations."). In any event, the present record does not permit resolution now. Therefore, to the extent Feld moves for summary judgment on the basis that FFIC breached its obligation to pay reasonable expenses, the motion will be denied.[6]

## IV. Breach of Implied Covenant of Good Faith and Fair Dealing

Finally, Feld alleges in Count II of his complaint that FFIC's refusal to pay the full amount of his defense costs is a breach of the duty of good faith and fair dealing. Compl. ¶ 88. According to Feld, FFIC's initial coverage letter—by denying coverage under the Policy while offering coverage subject to modified terms—put him in an "impossible position." Compl. ¶¶ 51–59. Because Feld thinks that "FFIC's breach merges with and assumed the character of a willful tort," Feld seeks punitive damages. Id. ¶ 94.

Again, no one seems to have thought this issue all the way through. Feld vigorously argues that Maryland law applies to this case. Yet, under Maryland law, Feld plainly loses. He acknowledges Maryland does not recognize a breach of the covenant of good faith and fair dealing as an independent claim for breach of contract. Pl.'s Opp'n at 38 ("Count II can be dismissed given that Maryland does not recognize breach of the implied duty of good faith and fair dealing as a separate cause of action."); see Stephens v. Liberty Mut. Fire Ins. Co., 821 F. Supp. 1119,

---

[6] FFIC argues that, as a matter of law, pursuant to the Policy's "no voluntary payments provisions," Feld is not entitled to "reimbursement of any amounts he voluntarily and without Fireman Fund's permission paid to Fulbright prior to even giving notice to Fireman's Fund." Def.'s Mot. for Summ. J. [ECF No. 68] at 29. That may be. See supra n.2 (rejecting Feld's main counter-argument, see Pl.'s Opp'n at 24–31). But summary judgment is still improper because the Court has no idea whether any of the disputed expenses are covered by that argument.

1122 (D. Md. 1993).  So, having won the choice-of-law battle, Feld nonetheless loses on this Count.  FFIC will accordingly be granted summary judgment on Count II.

## CONCLUSION

This case is an example of two parties determined to disagree on everything.  But there was a time, nearly seven years ago, when Feld agreed to the hourly rates proposed by FFIC.  Because of that agreement, the Court finds that Feld is not entitled to the lion's share of the disputed $2.1 million.  Nor does he state a claim for a breach of the implied duty of good faith and fair dealing. What remains is a dispute about the reasonableness of certain unreimbursed expenses—surely a sideshow to this long-running litigation circus, but one that now will become the main event because the Court cannot resolve the issue on the current record.  For these reasons, the Court will grant in part and deny in part FFIC's motion for summary judgment and deny Feld's corresponding motion.


_____ /s/
                JOHN D. BATES
          United States District Judge

Dated: September 12, 2016