# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KENNETH FELD,

     Plaintiff,

       v.                                Civil No. 12-1789 (JDB)

FIREMAN'S FUND INSURANCE
COMPANY,

     Defendant.

## MEMORANDUM OPINION

Plaintiff Kenneth Feld and his insurer, defendant Fireman's Fund Insurance Company ("FFIC"), have been fighting over attorney's fees for the better part of a decade. The present fees action stems from a separate personal injury dispute between Feld and his sister, filed in 2008, in which Feld incurred more than $4.5 million in legal fees and costs. FFIC paid over $2 million but refused to fully reimburse him, and Feld filed this suit in 2012 in an attempt to force FFIC to pay up in full. A lengthy discovery period ensued, followed by several motions, a trip to the court of appeals, and a trial. Now before the Court is Feld's motion for attorney's fees. He seeks the remainder of what he claims FFIC owes him for the initial dispute, prejudgment interest on that amount, and fees and expenses for this litigation (which itself has been contested for nearly eight years).

For the reasons explained below, the Court will (1) grant the motion in full as to the fees for the initial dispute, (2) grant the motion in part as to the fees and expenses for this litigation, and (3) deny the motion as to the requested prejudgment interest.

## I.  Background

The facts of this case have been summarized at length in prior opinions of this Court and in the D.C. Circuit's opinion, see Feld v. Fireman's Fund Ins. Co., 909 F.3d 1186, 1190–93 (D.C. Cir. 2018); Feld v. Fireman's Fund Ins. Co., 292 F.R.D. 129, 132–34 (D.D.C. 2013), so a brief recitation of the details will suffice here.  In 2007, Feld hosted a Shiva—a Jewish mourning ritual—for his recently deceased aunt in a condo he owned in Washington, D.C.  Feld, 909 F.3d at 1190.  He hired security guards for the event.  Id.  His sister, Karen, attended the Shiva but was later ejected from the condo building by Feld's guards.  Id.  Karen sued Feld in 2008 for injuries allegedly sustained during her removal from the building.  Id.

At the relevant time, Feld had personal liability insurance coverage through FFIC that "provided that FFIC would defend Feld against covered claims or suits against him."  Feld v. Fireman's Fund Ins. Co., 206 F. Supp. 3d 378, 381 (D.D.C. 2016).  Feld notified FFIC of Karen's personal injury suit against him (the "Underlying Litigation"), and FFIC agreed to both provide a defense and permit Feld to select his own counsel.  Id.

Feld selected the law firm Fulbright & Jaworski, LLP[1] to represent him in the Underlying Litigation, which culminated in a highly publicized and contentious two-week jury trial.  Id.  The jury found Feld not liable for any of the claims.  See Feld, 909 F.3d at 1193.  The lengthy and hard-fought litigation ended up generating a legal bill of more than $4.5 million dollars.  Feld, 206 F. Supp. 3d at 381.  But FFIC reimbursed Feld for only $2.1 million, insisting that Fulbright was bound by an alleged "rate agreement" that capped Fulbright's reimbursable rates at $250/hour for partners, $225/hour for associates, and $100/hour for paralegals.  Feld, 909 F.3d at 1191–93.

---

[1] The firm has since been renamed Norton Rose Fulbright.  See Post-Tr. Br. in Supp. of Pl. Kenneth Feld's Reasonable Att'y's Fees & Expenses ("Feld Br.") [ECF No. 157] at 2 n.2.  The Court will refer to the firm as "Fulbright" throughout this opinion.

About $2.2 million of the remaining $2.4 million of unreimbursed fees and expenses resulted from the "disparity between the hourly rates charged by Fulbright and those paid by FFIC," and the last $200,000 related to certain costs and expenses that FFIC deemed unreasonable.  Id. at 1193.

Feld filed this action (the "Fee Litigation") in November 2012 to recover the outstanding $2.4 million, claiming that FFIC had breached its "contractual obligation to pay reasonable defense fees and expenses."  Id.  In late 2015, following discovery, both parties moved for summary judgment.  See Def. FFIC's Mot. for Summ. J. & Mem. of P. & A. in Supp. Thereof [ECF No. 68]; Pl. Kenneth Feld's Mot. for Summ. J. & Statement of Supporting P. & A. [ECF No. 69].  The primary issue on summary judgment was whether a rate agreement had existed.  See Feld, 206 F. Supp. 3d at 381.  The parties' briefing also put the reasonableness of the hours billed by Fulbright into dispute.  See, e.g., Def. FFIC's Opp'n to Pl.'s Mot. for Summ. J. [ECF No. 83] at 21 ("Not only are the rates sought by Feld unreasonable, but many of the tasks for which he seeks reimbursement are on their face unreasonable."); Reply to Def. FFIC's Opp'n to Pl. Kenneth Feld's Mot. for Summ. J. [ECF No. 89] at 20–21 ("By approving as reasonable and necessary 98% of the hours for which Mr. Feld sought reimbursement, FFIC has waived its ability to argue that those same hours were unreasonable.").

The Court ruled on the summary judgment motions in September 2016.  The Court's opinion resolved three issues.  First, it rejected an argument made by FFIC that Feld had provided FFIC with "late notice" of his insurance claim.  See Feld, 206 F. Supp. 3d at 384.  Second, the Court held that a rate agreement existed as a matter of law, and thus Feld's "breach of contract action fail[ed] as to the $2,224,121.61 attributable solely to the parties' dispute as to attorney rates."  Id. at 389–90 (internal quotation marks omitted).  Third, the Court rejected Feld's claim that FFIC had breached an implied covenant of good faith and fair dealing.  Id. at 393.  The Court's

opinion also, in Section III, left in dispute at least one issue: whether FFIC had "breached its obligation to pay reasonable expenses." Id. at 392. The opinion did not explicitly address the reasonableness of the hours billed by Fulbright.

After the Court's summary judgment opinion was issued, the parties began negotiations to "settle the issues remaining before the Court." Joint Status Report [ECF No. 98] at 1. On November 6, 2017, the parties filed a joint stipulation for partial dismissal with prejudice, informing the Court that they had "entered into a Settlement Agreement and Partial Release . . . with respect to any and all matters remaining in dispute in the Lawsuit after the entry of the Court's [September 12, 2016 opinion], including those parts of Plaintiff's claims identified in Section III." Joint Stip. For Partial Dismissal with Prejudice & Entry of Final J. [ECF No. 102] at 1. The stipulation noted that the agreement "does not apply to those matters resolved through the Memorandum Opinion." Id. The Court thereafter entered an order dismissing the case with prejudice pursuant to the terms of the parties' Settlement Agreement, retaining jurisdiction only to enforce the terms of the agreement. Order of Nov. 8, 2017 [ECF No. 103].

Feld then appealed to the D.C. Circuit, primarily challenging this Court's ruling that a binding rate agreement existed as a matter of law. See Pl.'s Notice of Appeal [ECF No. 104]; Feld, 909 F.3d at 1193. Finding material facts at issue, the D.C. Circuit vacated this Court's decision and remanded for a jury trial on the question whether a rate agreement existed, noting that "[i]f the jury reaches a verdict in favor of Feld and finds that no agreement was reached, then a determination will have to be made regarding reasonable rates for fees." Feld, 909 F.3d at 1198.

This Court held a trial on the rate agreement question in July 2019. The jury found that FFIC had not proven that a rate agreement existed. See Verdict Form [ECF No. 147]. The Court then set a briefing schedule for the present motion for attorney's fees. That briefing revealed that

Feld and Fulbright had entered into a contingency fee agreement with respect to the Fee Litigation, see Post-Trial Br. in Supp. of Pl. Kenneth Feld's Reasonable Att'y's Fees & Expenses ("Feld Br.") [ECF No. 157] at 44 n.33, and the Court ordered Feld to file that agreement under seal, see Minute Order of Dec. 16, 2019.

The contingency fee agreement "memorializes the terms and conditions" for Fulbright's representation of Feld in the Fee Litigation. Fee Agreement [ECF No. 170-1] at 1. The agreement was "in lieu of an hourly billing arrangement" and provides that Feld will pay Fulbright a percentage of the "Gross Recovery" obtained in the Fee Litigation, with the percentage varying depending on when recovery is obtained. Id. at 1–2. For instance, if recovery is obtained after discovery but before trial, Feld would owe Fulbright 33% of the Gross Recovery; if recovery is obtained after the first day of trial, he would owe Fulbright 40% of the Gross Recovery. See id. Gross Recovery means "any recovery actually obtained and received from FFIC by settlement or judgment or otherwise, on account of any or all of the Client Claims." Id. at 2. As the case is now in the post-trial stage of litigation, Feld owes Fulbright 40% of the Gross Recovery. The agreement also provides that Feld is responsible for "pay[ing] all charges for other services and expenses . . . incurred," such as for "messenger fees" or "postage." Id. Moreover, the agreement "does not include the prosecution or defense of any appeals." Id. at 1.

After receiving the fee agreement, the Court held a motions hearing on December 17, 2019. At the hearing, it emerged that the Court needed additional briefing on two issues: (1) whether FFIC had "legally waived or otherwise forfeited its right to challenge the reasonableness of hours with respect to the underlying litigation" and (2) the appropriateness of the contingency fee agreement and its possible effect on the calculation of attorney's fees. See Minute Entry of Dec.

17, 2019.  The Court has now received the supplemental briefing, and the motion for attorney's fees is ripe for decision.

## II.     Legal Framework

The applicable state law governing Feld's insurance policy, and thus this attorney's fees request, is Maryland law.  See Feld, 909 F.3d at 1194; United States v. One Parcel of Property Located at 414 Kings Highway, 1999 WL 301704, at *4 (D.D.C. May 11, 1999) ("In diversity cases, attorney's fees are considered substantive and are controlled by state law." (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31 (1975))).  In Maryland, "[t]he party requesting fees has the burden of providing the court with the necessary information to determine the reasonableness of its request."  Myers v. Kayhoe, 892 A.2d 520, 532 (Md. 2006). The "determination of the reasonableness of attorney's fees is a factual determination within the sound discretion of the [trial] court."  Id.  That determination should be guided by the following eight factors, set forth in Rule 1.5 of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"):

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

Bd. of Trs. v. Patient First Corp., 120 A.3d 124, 143 (Md. 2015) (quoting MLRPC 1.5(a)).  But "[a] court need not comment or make explicit findings as to each factor," and "may also consider, in its discretion, any other factor reasonably related to a fair award of fees."  Id.

## III.    The Underlying Litigation

The Court first addresses Feld's request for $2,224,121.61 in attorney's fees as to the Underlying Litigation. At its core, this fees request is a contractual dispute over what FFIC owed to Feld under his insurance policy. FFIC argues that both the hours and the rates charged by Fulbright are unreasonable. <u>See</u> Def. FFIC's Opp'n to Pl.'s Br. Re. Att'ys' Fees & Expenses ("FFIC Opp'n") [ECF No. 164] at 11, 24.

### A. Hours

Before the Court can evaluate the reasonableness of the hours billed in the Underlying Litigation, it must determine whether FFIC can even still challenge the reasonableness of the hours, given prior events in this Fee Litigation. Feld argues that FFIC has waived any challenge to the hours, either (1) through the formal doctrine of legal waiver or (2) by operation of the Settlement Agreement. <u>See</u> Pl. Kenneth Feld's Br. Re. Def.'s Waiver & Forfeiture of Right to Challenge Reasonableness of Hours ("Feld Waiver Br.") [ECF No. 176] at 1–2. The Court agrees with the second argument and so has no need to address the first.

The Settlement Agreement, which was negotiated and signed after the Court's September 2016 opinion, states that "the Parties want to forever compromise, resolve and settle <u>any and all matters remaining in dispute in the Lawsuit</u> after the entry of the Memorandum Opinion, <u>including those parts of Plaintiff's claims identified in Section III of the Memorandum Opinion</u>." Agreement [ECF No. 177-1] at 1 (emphasis added). The Agreement did not, however, "releas[e] or discharg[e] any matters that <u>were</u> resolved" in the opinion. <u>Id.</u> (emphasis added). Feld argues that the opinion did <u>not</u> resolve the issue of the reasonableness of hours billed in the Underlying Litigation (despite the parties having raised the issue in their summary judgment briefing) and therefore that any challenge to the reasonableness of those hours is barred by the Agreement. Feld

Waiver Br. at 5–6.  The question for the Court is whether the September 2016 opinion did in fact leave in dispute the reasonableness of the hours billed.

As noted above, the September 2016 opinion addressed four issues.  Two have no possible bearing on the reasonableness of the hours: FFIC's "late notice" claim and Feld's breach of good faith claim, both of which the Court rejected.  See Feld, 206 F. Supp. 3d at 384, 393.  The other two issues discussed in the opinion could possibly bear on the reasonableness of hours and merit further consideration.

First, in Section III of the opinion, labeled "Expenses," the Court addressed Feld's request for reimbursement of what the Court initially called "$200,000 in expenses."  Id. at 390.  As the Court acknowledged in a footnote, however, this amount "actually includes some attorney and paralegal time (i.e., 'fees'), but only as to the reasonableness of the time expended, not the rates charged."  Id. at 390 n.3; see also Compl. [ECF No. 1] ¶ 50 (alleging that FFIC failed to reimburse some costs, expenses, and attorney time).  The Court proceeded to analyze the request as if it involved a broader dispute over the reasonableness of the hours claimed, referring in particular to each of the parties' expert reports and their analysis of the reasonableness of Fulbright's legal expenses.  See Feld, 206 F. Supp. 3d at 390–92.  Notably, none of those experts specifically discussed the "$200,000 in expenses," instead speaking more broadly about Fulbright's billings in total.  See Expert Report of William H. Jeffress, Jr. ("Jeffress Report") [ECF No. 70] at 7–9; Report of Def.'s Expert Witness, Bernd G. Heinze ("Heinze Report") [ECF No. 80] at 14–17.  The Court concluded that the only thing that was certain was that the total amount of expenses and fees left in dispute was uncertain: to that end, the Court identified a possible discrepancy between Feld's complaint and his briefing and suggested that significantly more than $200,000 might remain in dispute, see, e.g., Feld, 206 F. Supp. 3d at 391 ("FFIC's expert opines on several unreasonable

expenses, but those instances by themselves well exceed the amount that Feld thinks is in dispute. . . . Perhaps these costs were paid in part, leaving some reduced amount in dispute, but who knows?").  Given this uncertainty, the Court held broadly that "to the extent Feld moves for summary judgment on the basis that FFIC breached its obligation to pay reasonable expenses, the motion will be denied."  <u>Id.</u> at 392.

The Court now concludes that the best interpretation of Section III is as explicitly indicating that the opinion was <u>not</u> resolving the question of the reasonableness of the hours billed in the Underlying Litigation.  Not only does Section III pointedly decline to even nail down the amount in question, but it also discusses the contrasting amounts claimed in Feld's various filings and opined on by the parties' experts.  And beyond those explicit indications, Section III has a general tenor of confusion and skepticism that certainly implies that the hours remained in dispute.

Moreover, the Agreement does not <u>limit</u> the settled claims to those matters discussed in Section III.  Instead, it settles "any and all matters remaining in dispute in the Lawsuit."  Agreement at 1.  Thus, even if Section III were interpreted as addressing only some narrowly defined portion of expenses, the fact remains that nowhere else in the September 2016 opinion did the Court discuss the reasonableness of hours more generally or suggest that it was resolving that issue. Indeed, analysis of the second issue discussed in the opinion with some potential bearing on the reasonableness of hours—whether a rate agreement existed—lends even further support to the Court's present conclusion that the hours were left in dispute.  One searches the rate agreement discussion in vain for any suggestion, implied or otherwise, that the Court was deciding the reasonableness of the hours.  In fact, the holding of that portion of the opinion states explicitly that Feld's "breach of contract action fails as to the $2,224,121.61 attributable <u>solely to</u> the parties'

dispute as to attorney rates." Feld, 206 F. Supp. 3d at 390 (emphasis added) (internal quotation marks omitted).

FFIC's waiver briefing even seems to concede that the September 2016 opinion left the reasonableness of hours open. For instance, FFIC asserts that "[t]he Court did not address the merits of Feld's claim for $2.2 million, which would have required an examination of both the hourly rates Feld sought and the number of hours against which he wanted to apply such rates." FFIC's Reply Br. Regarding Waiver [ECF No. 181] at 3. Likewise, FFIC also argues that its challenges to the number of hours were "temporarily mooted by the fact that judgment had been entered in Fireman's Fund's favor." Id. The language of the Settlement Agreement that it settled "any and all matters remaining in dispute in the Lawsuit" would include any temporarily mooted challenges. Agreement at 1.

At the end of the day, the Agreement is quite clear that it settled any matters still in dispute after entry of the Court's September 2016 opinion. Neither Section III, nor any other part of the opinion, came to any conclusion about whether the hours charged by Fulbright were reasonable. As a result, the Agreement settled any remaining dispute over the reasonableness of the hours and FFIC cannot now challenge them. See Halldorson v. Sandi Grp., 934 F. Supp. 2d 147, 153 (D.D.C. 2013) ("If claims have been released through a settlement agreement, a court will bar those claims . . . ."); see also Parker v. U.S. Dep't of Agriculture, 404 F. Supp. 3d 31, 43 (D.D.C. 2019) ("An agreement between the parties dismissing all claims is the equivalent of a decision on the merits and thus claims settled by an agreement are barred by res judicata."). The Court will therefore accept the reasonableness of the requested hours for the Underlying Litigation, disregard FFIC's arguments to the contrary, and move on to the reasonableness of Fulbright's rates.

**B. Rates**

The parties agree that the eight MLRPC factors govern the Court's evaluation of the reasonableness of Fulbright's rates.  See Feld Br. at 3; FFIC Opp'n at 9–10.  And while courts "need not comment or make explicit findings as to each factor," Patient First Corp., 120 A.3d at 143, the Court will address most of the factors at least briefly, skipping over only the fifth and eighth factors, which are not relevant here.  The Court notes in advance that while Maryland law governs, the relevant market for similar legal services here is the District of Columbia,[2] so the Court will frequently use cases from this federal district or the D.C. Circuit as factually relevant and helpful.

    **a. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.**

The bulk of the parties' briefing focuses on this first factor, which looks at the overall complexity of the Underlying Litigation.  Feld argues that it was "complex federal litigation," Feld Br. at 7, while FFIC argues that it was instead a simple and "straightforward bodily-injury case," FFIC Opp'n at 11.  Determining the relative complexity of the litigation is essential because it allows the Court to avail itself of the applicable "matrix showing the average hourly price tag of comparable lawyers" in similarly complex litigation that "may provide a useful starting point in calculating market rates." DL v. District of Columbia, 924 F.3d 585, 589 (D.C. Cir. 2019) (internal quotation marks omitted).  Notably, matrices are not binding in and of themselves: "because such matrices are somewhat crude," the proponent "may point to additional evidence, which can include surveys to update the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications

---

[2] Both sides agree that D.C. is the relevant legal community.  Feld Br. at 13; FFIC Opp'n at 12.

handling similar cases." Id. (internal quotation marks omitted). No one type of evidence "can be considered gospel," even the applicable matrix. Id. Nonetheless, matrices are still highly useful, and the D.C. Circuit has recently confirmed that the applicable matrix for "complex federal litigation" in D.C. is the LSI Laffey Matrix. Id. at 594.

D.C. courts have struggled to define precisely what it means for something to be "complex federal litigation." They have, however, identified certain elements that tend to make a case "complex," such as procedural complexity, the involvement of expert witnesses, time-consuming delays, and multiple in-court hearings. See Merrick v. District of Columbia, 134 F. Supp. 3d 328, 339 (D.D.C. 2015); cf. Snead v. District of Columbia, 139 F. Supp. 3d 375, 380 (D.D.C. 2015) (concluding that case was not complex because "[t]here was no formal discovery, no lengthy argument, limited motion practice, and a single informal hearing"); Cox v. District of Columbia, 754 F. Supp. 2d 66, 76 (D.D.C. 2010) (concluding that case was complex and that it was "absurd" to think otherwise because "it took nearly two years" and involved "a hearing with sixty-five documentary exhibits, four witnesses, and written closing statements").

Applying these elements to the present case, the Court concludes that the Underlying Litigation was complex federal litigation, as Feld argues, rather than a straightforward bodily injury case. Several facts support this conclusion.

First, Karen's suit against Feld sought $110 million in damages under five different legal theories. See Compl., Feld v. Feld, No. 08-cv-01557, at ¶¶ 123–74 (D.D.C. Sept. 9, 2008). And her complaint alleged extreme violence, sexual assault, and serious bodily injuries with permanent residual damage. Id. The hefty damages sought and weighty charges alleged weigh in favor of complexity. While FFIC is correct that Karen was eventually limited to pain and suffering

damages, see FFIC Opp'n at 11, that happened only at trial, three years after Feld had retained Fulbright, Dep. of Bernd G. Heinze ("Heinze Dep.") [ECF No. 167-4] at 236–37.

Second, the case turned out to be procedurally very complex, with multiple discovery disputes and hearings, a mediation session, dozens of depositions, and a recalcitrant plaintiff who refused to sit for a deposition. Jeffress Report at 6–7. All that was followed by a 12-day trial and subsequent appeal to the D.C. Circuit. Id.; cf. Reed v. District of Columbia, 843 F.3d 517, 525 (D.C. Cir. 2016) (noting that the presence of "extensive" discovery makes cases more complex).

Third, the case generated significant publicity and media attention, as this Court has previously recognized. See Feld, 206 F. Supp. 3d at 381.

Fourth, Karen retained highly skilled counsel to represent her in the case. See Feld Br. at 11. For example, lead counsel had been a partner at Williams & Connolly, a top D.C. law firm, before starting his own firm. Decl. of John M. Simpson ("Simpson Decl.") [ECF No. 71] ¶ 17. Her other counsel were similarly qualified. See id. The quality of opposing counsel suggests that it would have been difficult for Feld to prevail without hiring similarly qualified counsel of his own—and that if he had hired inferior counsel, he could have been found liable for some or all of the requested $110 million.

Fifth, FFIC's accountant previously determined that 98% of the hours billed by Fulbright—who had staffed the case as if it were complex and high-stakes—were reasonable. See Dep. of Bruce Bryson ("Bryson Dep.") [ECF No. 76 at 175–76] at 36:19–37:10.

Sixth, FFIC's own "high exposure" technical director, Charles Kirk, determined that the case "fit the parameters of the high-exposure program" within FFIC. Videotaped Dep. of Charles Kirk ("Kirk Dep.") [ECF No. 160] at 63:8–24; Trial Tr. Day 3 [ECF No. 158-1] at 28:11–23. Several factors go into such determinations, including whether (1) the case exposure was $1

million or more; (2) plaintiff alleged catastrophic injuries; (3) the case had complex legal issues; and (4) the case was receiving media exposure. Trial Tr. Day 3 at 27:7–28:1. According to Kirk's deposition, he took the case because it "met the criteria of the high-exposure group." Kirk Dep. at 121:19–23. Each of these criteria suggests that the case was more than a straightforward bodily injury case. See also Bryson Dep. at 134:4–135:3 (noting that Kirk's handling of a case "would have been an indication to me, as an auditor, that this was not a run-of-the-mill, third party liability case and that there was some degree of elevated importance associated with it").

Against these facts pointing toward complexity, the only thing that FFIC can muster in its favor is that Fulbright supposedly knew the case had no merit well before trial began. See FFIC Opp'n at 16–19. Even if that were true (a big if, considering the length of trial and number of witnesses and experts presented on both sides), cases with very little merit must still be litigated to completion. Here, Karen's highly skilled lawyers, the high damages sought, publicity, and the conclusions of FFIC's own auditor and high exposure technical director all point toward complexity. The Court therefore concludes that this case qualifies as "complex federal litigation," and that the first MLRPC factor weighs in favor of finding Feld's requested fees reasonable.

### b. The likelihood that the acceptance of the particular employment will preclude other employment of the lawyer

The declaration of John Simpson, a partner at Fulbright, states that based on his "knowledge of the respective workloads of the attorneys working on the Underlying [Litigation] during the time in question," the attorneys who worked on Feld's case "would have been engaged in similarly compensated work for other clients had they not been assigned" to Feld's case. Simpson Decl. ¶ 102. This directly contradicts the statement in FFIC's brief that "there has been no representation that any Fulbright attorney had to 'pass' on other work to represent Mr. Feld."

FFIC Opp'n at 43.  As FFIC presents no other argument with respect to the second factor, Simpson's sworn affidavit is sufficient, and the second factor weighs in favor of reasonableness.

### c.   The fee customarily charged in the locality for similar legal services

The Court has determined that the Underlying Litigation constituted "complex federal litigation."  As such, the relevant benchmark for similar legal services is rates charged for other complex federal litigation in the community.   Feld has presented substantial evidence that Fulbright's rates are similar to those charged by peer firms in the District of Columbia for similar services, such as the Jeffress Report, the LSI Laffey Matrix, comparable D.D.C. cases from the relevant time period, and National Law Journal billing surveys.  Feld Br. at 13–20.  FFIC does not mount much of a challenge to this evidence; instead, it falls back on its argument that this case was not complex and thus the relevant rates to compare Fulbright's with are rates charged in straightforward bodily injury cases.  This argument isn't any more persuasive the second time around, and the Court concludes that Feld's evidence supports the reasonableness of Fulbright's rates.

### i.   The Jeffress Report

William H. Jeffress, Jr. is a long-time D.C. lawyer and expert witness on attorney's fees who is familiar with the "hourly rates of lawyers engaged in civil and criminal litigation" in D.C. Jeffress Report at 1–2.  He was retained by Feld in this matter.  Jeffress concluded, after examining in detail Fulbright's invoices from 2010 and 2011, when 72% of all fees in the Underlying Litigation were incurred, that Fulbright's rates "are well within the range of rates charged during 2010 and 2011 by lawyers with comparable experience."  Id. at 3–4.  He also opined that the rates were what a "litigant would have expected to pay for comparably qualified lawyers in federal court

litigation in Washington, D.C. having the stakes that this case had for Kenneth Feld." Id. at 4. The Report supports the reasonableness of Fulbright's rates.

### ii. John Simpson Affidavit

Simpson submitted an affidavit stating that, based on his thirty-seven years of practice in D.C., the rates that Fulbright charged in the Underlying Litigation during 2007 through 2012 "all fall within the range of rates prevailing in the District of Columbia . . . for similar services by lawyers and other professionals of reasonably comparable skill, experience, and reputation." Simpson Decl. ¶ 91. The affidavit supports the reasonableness of Fulbright's rates.

### iii. The Heinze Report

Bernd G. Heinze is an insurance industry expert who provides consultative services regarding various insurance matters. Heinze Report at 5. He is not licensed to practice law in D.C. Heinze Dep. at 52:6–11. He was retained by FFIC in this matter.

Heinze's report takes issue with Jeffress's characterization of this case as "complex"; Heinze concludes that the claims at issue in the case "are common claims under common law and do not warrant, in [his] over 30 years of experience and opinion," the rates charged by Fulbright. Heinze Report at 11–12. As the Court explained above, the Underlying Litigation is properly classified as complex. Heinze's report fails to take into account the quality of opposing counsel, seriousness of the allegations, and the procedural complexity of the case. As a result, the rest of Heinze's report, which is based on the notion that the Underlying Litigation was simple, and that the market for similar services encompasses only simple and straightforward personal-injury claims, is mostly irrelevant for evaluating whether Fulbright's rates were comparable to those charged for similar services.

#### iv. The LSI Laffey Matrix

Because the Underlying Litigation was "complex federal litigation," the LSI Laffey Matrix is applicable. See DL, 924 F.3d at 594. The Court has compared Fulbright's rates for 2007–2011 (the years relating to the Underlying Litigation) with the Laffey rates. In nearly every year, all or most of the Fulbright attorneys staffed to the Underlying Litigation billed at or below the Laffey rate for attorneys of similar experience. It is true that, in certain years, some Fulbright attorneys did bill above Laffey rates. But the Court is mindful that the goal of attorney's fees awards is "rough justice." See Fox v. Vice, 563 U.S. 826, 838 (2011). In the years that Fulbright had some attorneys billing at rates above Laffey rates, those rates typically exceeded Laffey by only a small amount, and in the same years other attorneys billed below the Laffey rates, with a considerably larger number of hours billed. Based on the Court's rough calculations, Fulbright thus charged less than it would have if it had followed the Laffey rates exactly.[3] That is not to say that a comparison between Fulbright's billed rates and the hypothetical scenario where Fulbright billed precisely the Laffey rates is determinative. Nor is it to say that a court can merely compare a firm's billed rates to Laffey and conclude that because the firm's rates averaged out to the Laffey rates, they are ipso facto reasonable, without taking into account the hours billed by the attorneys.[4] It's simply to say that where a Matrix is intended to serve as a "useful starting point" for comparison, DL, 924 F.3d at 589, and a firm's rates on average line up with the Matrix rates, with some modestly above and some modestly below the Matrix, the Matrix generally supports the reasonableness of those rates, absent some other factor such as a disproportionate number of hours

---

[3] In total, across 2007 to 2011, Fulbright ended up charging about $50,000 more than it would have had it never charged rates above Laffey. But it also charged about $165,000 less than it would have had it never charged rates below Laffey.

[4] For instance, if the Laffey rate for two attorneys was $600/hour, and Attorney One billed $10 below and Attorney Two billed $10 above, the two attorneys' rates would average out to Laffey. But if Attorney One billed only 10 hours and Attorney Two billed 1,000 hours, it is clear that Attorney Two's departure from Laffey is of much more significance—and may be more unreasonable—than Attorney One's departure.

being billed by the attorneys charging above Matrix rates.  No such factor exists here, and the Laffey Matrix therefore weighs in favor of the reasonableness of Fulbright's rates.

### v. Comparable D.D.C. cases

Feld cites a number of cases in which judges in this district awarded similar rates to those sought here for cases of similar complexity.  See Feld Br. at 18–19.  The Court won't go into detail on each of those cases, except to point out that the cases generally awarded Fulbright's peer firms their standard rates, which were at or above the rates Fulbright charged in the Underlying Litigation, thereby supporting Fulbright's rates as reasonable.  For instance, in 2006, Judge Collyer awarded one of Fulbright's peer firms its standard rates (which were higher than Fulbright's) in a dispute involving the construction and sale of a home, for a total fees award of $775,320.  See Wilcox v. Sisson, 2006 WL 1443981, at *1 (D.D.C. 2006).

### vi. National Law Journal Billing Surveys

Fulbright also submitted a comparison between its rates in the Underlying Litigation and those charged by peer firms in D.C., as recorded in a survey by the National Law Journal.  See National Law Journal Surveys [ECF No. 158-8].  The surveys show that Fulbright was at or below its peers' rates for both partners and associates in each year from 2007 to 2011.  Id.  They thus support Fulbright's rates as reasonable.

### d. The amount involved and the results obtained

Karen sought $110 million dollars in tort damages in the Underlying Litigation.  The total attorney's fees sought (the $2.2 million sought in this litigation plus the $2.1 million that FFIC already paid) equal about 3.9% of that total.  In exchange, Fulbright obtained a full victory on all of Karen's claims against Feld.  The degree of success obtained is the most "critical factor" when evaluating claims for attorney's fees.  Friolo v. Frankel, 373 Md. 501, 525 (2003) (quoting Hensley

v. Eckerhart, 461 U.S. 424, 436 (1983)).  As a result, this fourth factor weighs in favor of reasonableness.

### e.  The nature and length of the professional relationship with the client

Fulbright has a long history of representing Feld in litigation, during which the firm "developed substantial knowledge of the relationships between various members of the Feld family."  Simpson Decl. ¶ 15.  However, it is unclear from the firm's declarations whether it has ever represented Feld in cases like the Underlying Litigation involving tort liability.  This sixth factor, then, weighs only slightly in favor of reasonableness.

### f.  The experience, reputation, and ability of the lawyers performing the services

Fulbright typically had one to two partners and one to three associates/senior counsel working on the Underlying Litigation at any given time.  Simpson Decl. ¶ 16.  The number of attorneys was usually comparable to the number representing Karen.  See id. ¶¶ 17–18.  Fulbright's attorneys ranged in experience levels.  The main partner on the case, Matt Kirtland, had experience in "defending clients against tort allegations."  Id. ¶ 23.  The associates and senior counsel on the case primarily had experience in complex civil litigation.  See, e.g., id. ¶ 58.  Fulbright declares that tasks were assigned based on experience and skill.  See id. ¶ 16.  FFIC's only rebuttal is that none of the attorneys had experience with personal injury cases; however, as noted above, this case was more analogous to other complex civil litigation than it was to run-of-the-mill personal injury cases.  Moreover, Kirtland had experience in dealing with tort cases like Karen's.  Id. ¶ 23.  This seventh factor weighs in favor of reasonableness.

### g.  In sum

Based on these factors, all of which weigh in favor of reasonableness, the Court concludes that the rates that Fulbright charged in the Underlying Litigation were reasonable.

### C.  Conclusion with respect to Underlying Litigation

Because FFIC can no longer challenge the hours billed in the Underlying Litigation and the Court has concluded that Fulbright's rates were reasonable, the Court will award Feld the full amount of attorney's fees sought for the Underlying Litigation, $2,224,121.61.

### IV.    Prejudgment Interest

Feld argues that he is entitled to prejudgment interest on unpaid attorney's fees relating to the Underlying Litigation.  Feld Br. at 23.  Maryland law governs Feld's prejudgment interest claim, because it governs his insurance policy.  See Thornhill v. Donnkenny, Inc., 823 F.2d 782, 787 (4th Cir. 1987).

In Maryland, a claim of prejudgment interest is "allowable as a matter of right when the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date."  Buxton v. Buxton, 770 A.2d 152, 165 (Md. 2001) (emphasis added) (internal quotation marks omitted); see also Merrick v. Mercantile-Safe Deposit & Trust Co., 855 F.2d 1095, 1106 (4th Cir. 1988) (interpreting Maryland law and noting that "interest may be recovered, even where the damages sustained" are "not liquidated in the strict sense of the term," but are "otherwise readily ascertainable" (internal quotation marks omitted)).  In discussing prejudgment interest, Maryland courts typically distinguish between cases at opposite ends of the spectrum: at one end, cases involving written contracts providing for a specific amount of money to be paid on a specific day; at the other end, tort cases "where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement."  Buxton, 770 A.2d at 165.  In the former category of cases, prejudgment interest as a matter of right is proper; in the latter category, it is not.

The main question for the Court is whether the amount of attorney's fees on the Underlying Litigation was "certain, definite, and liquidated" by some specific date prior to judgment in this case. Feld argues that the amount was reasonably ascertainable at the time FFIC denied payment, presumably because Fulbright had submitted to FFIC invoices which contained its assessment of the applicable rates and number of hours, and the amount of attorney's fees was thus theoretically calculable. See Feld Br. at 24. In response, FFIC argues that the amount was not "liquidated" at the time of the invoices, evidenced by the fact that the Court could modify Feld's request as to hours or rates—therefore, the amount is not liquidated until the Court enters judgment. FFIC Opp'n at 46.

The Court agrees with FFIC that the amount of attorney's fees for the Underlying Litigation was not "certain, definite, and liquidated" at any time prior to the Court's eventual judgment. Maryland caselaw makes clear that "a claim for reasonable and necessary attorney's fees incurred in litigation is an <u>unliquidated</u> one, i.e., one, the amount of which has not been fixed by agreement or cannot be exactly determined by the application of rules of arithmetic or law." <u>Selective Way Ins. Co. v. Nationwide Property & Cas. Ins. Co.</u>, 2019 WL 5588994, at *25 (Md. Ct. Spec. App. Oct. 30, 2019) (cleaned up). <u>Selective Way</u>, and the Maryland cases it relies on, are dispositive of Feld's prejudgment interest as a matter of right claim. The actual amount of reasonable attorney's fees cannot be determined and is thus unliquidated until this Court makes a ruling as to what reasonable attorney's fees are.

Feld's reply brief raises the additional argument that the Court should grant prejudgment interest as a matter of discretion. Courts in this Circuit ordinarily do not consider arguments raised for the first time in reply briefs. See <u>Newspaper Ass'n of Am. v. Postal Reg. Comm'n</u>, 734 F.3d 1208, 1212 (D.C. Cir. 2013) ("[W]e have repeatedly held that we do not consider arguments raised

only in a reply brief."); <u>Singletary v. District of Columbia</u>, 685 F. Supp. 2d 81, 92 (D.D.C. 2010) ("As a general rule, courts should decline to consider arguments raised for the first time in reply.").

But even if the Court were to consider the argument, it would still decline to award prejudgment interest as a matter of discretion. Maryland cases have identified a number of factors to be considered in such discretionary awards, including whether (1) the express terms of the relevant contract entitled plaintiff to a "sum[] certain," <u>I.W. Berman Props. v. Porters Bros, Inc.</u>, 344 A.2d 53, 77 (Md. 1975); (2) whether defendant had paid plaintiff an amount that it "concededly owed" plaintiff under defendant's own theory of the case, <u>id.</u>; (3) whether defendant had made any effort to meet plaintiff halfway, <u>Crystal v. West & Callahan, Inc.</u>, 614 A.2d 560, 572 (Md. 1992); (4) whether there was a "legitimate dispute over [a party's] entitlement," <u>Dep't of Gen. Servs. v. Harmans Assoc.</u>, 633 A.2d 939, 950 (Md. Ct. Spec. App. 1993); and (5) whether there was "fraud associated with the execution of the [contract]," <u>Seton v. United Gold Network, LLC</u>, 2008 WL 1925180, at *13 (D. Md. 2008). Here, only the fact that FFIC had use of the $2.2 million during the pendency of this Fee Litigation weighs in favor of an award of prejudgment interest. The rest of the factors all weigh against such an award: FFIC committed no fraud in refusing to pay the full amount of attorney's fees; the amount was unliquidated, so there was no "sum certain"; there was a legitimate dispute as to the existence of the rate agreement that had to be resolved ultimately by jury trial; and FFIC met Feld halfway by awarding fees under the rate agreement (i.e., paying the amount that it "concededly owed" Feld under its own theory of the case"). These factors outweigh the first and the Court will award no prejudgment interest in its discretion.

## V.    The Fee Litigation

### A.  Attorney's Fees

The Court next addresses Feld's request for $2,367,112.03 in attorney's fees related to the Fee Litigation.  Unlike in his request for attorney's fees as to the Underlying Litigation, Feld does not have a contractual right—through the insurance coverage—to any fees for the Fee Litigation, which he initiated in order to force FFIC to fulfill its contractual obligations, nor any statutory fee shifting.  Indeed, the typical American rule is that parties to litigation are responsible for their own legal fees.  See Henriquez v. Henriquez, 992 A.2d 446, 450–51 (Md. 2010).

To support his entitlement to fees in this litigation, Feld invokes the Maryland exception to the American rule.  In Maryland, it is "firmly established . . . that if an insured 'must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation.'"  Gao v. Progressive Max Ins. Co., 2019 WL 1643775, at *3 (Md. Ct. Spec. App. April 16, 2019) (emphasis added) (quoting Nolt. v. U.S. Fid. & Guar. Co., 617 A.2d 578, 584 (Md. 1993)).  The exception was adopted because, in declaratory judgment actions to establish that a liability insurer had a duty to defend an insured, it would be "unfair to the insured" to require him to "bear the expense of such litigation," as he would likely end up "no better off financially than if he had never had the contract right."  Cohen v. Am. Home. Assur. Co., 258 A.2d 225, 235 (Md. 1969); see Selective Way, 219 A.3d at 60 (noting that the purpose of the Maryland exception is to put the insured "in as good a position as [he] would have occupied had [the insurer] performed its contractual obligation").  And the exception applies broadly to "actions for recovery of litigation expenses from a liability insurer, even where the duty to defend is not in issue."  Baker's Express, LLC v. Arrowpoint Capital Corp., 2012 WL 4370265, at *31

(D. Md. Sept. 20, 2012); see also Cont'l Cas. Co. v. Bd. of Educ., 489 A.2d 536, 537–38 (Md. 1985) (noting that insurer must pay costs of defense whether that responsibility arose from explicit "duty to defend" or from contract provision requiring insurer to pay for insured's "'loss,' defined to include the cost of defense").

Here, FFIC had a duty to defend Feld by paying reasonable fees and expenses for his legal defense. The duty to defend "is a continuing duty that runs throughout the course of the underlying tort litigation against the insured." Jones v. Hyatt Ins. Agency, Inc., 741 A.2d 1099, 1104 (Md. 1999). As the Court concluded in section III of this opinion, FFIC breached its duty to defend Feld, at least in part, by reimbursing him for only $2.1 million of his $4.5 million legal bill. FFIC argues that the Maryland exception should not apply here because FFIC's partial reimbursement was based on a good faith belief that there was a rate agreement in place, see FFIC Opp'n at 49, but Maryland law is clear that an insurer's obligations do "not depend on whether the denial of coverage by the insurer was reasonable or unreasonable, justified or unjustified, a close question of fact or a matter not even subject to legitimate dispute"; instead, "[t]he focus is exclusively on the bottom line." Commercial Union Ins. Co. v. Porter Hayden Co., 698 A.2d 1167, 1219 (Md. Ct. Spec. App. 1997); see Canopius US Ins., Inc. v. RN'G Constr., Inc., 2016 WL 4076091 at *8 (Md. Ct. Spec. App. Aug. 1, 2016) (awarding fees under the Maryland exception even though insurer had paid half of the insured's defense costs, because the insurer had been "wrong in refusing to pay the full amount of the defense costs"). The Court therefore concludes that FFIC owes Feld some attorney's fees under the Maryland exception.

The next question is just how much in attorney's fees Feld is entitled to—and how to calculate that amount. Feld argues that the Court should, just as it did with respect to the Underlying Litigation, primarily look at whether the hours Fulbright spent on the Fee Litigation

and the rates associated with those hours were reasonable under the eight MLRPC factors.  <u>See</u> Pl. Kenneth Feld's Br. Regarding Contingency Fee Agreement ("Feld Contingency Br.") [ECF No. 178] at 7–8.  FFIC, in contrast, argues that the existence of the contingency fee agreement mandates a completely different approach.  <u>See</u> FFIC's Br. Re. Feld's Contingency Fee Arrangement ("FFIC Contingency Br.") [ECF No. 174] at 1.  In FFIC's view, the Court should look only to what fees Feld has "actually incurred" under the fee agreement and should entirely disregard the timesheets that Feld has submitted in support of its fee request, since those amounts were never actually billed to Feld.  <u>See id.</u>

The Court mostly agrees with FFIC.  It is true, as Feld argues, that in most circumstances "a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees," and fees should instead be calculated per the maxim that they "are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent."  <u>Blanchard v. Bergeron</u>, 489 U.S. 87, 93, 96 (1989); <u>see</u> Feld Contingency Br. at 7–8.  However, that maxim is subject to a significant caveat: it applies only when calculating fees pursuant to a fee-shifting statute that allows "courts to award prevailing parties 'reasonable attorney's fee[s] as part of the costs,' without any requirement that those fees be 'incurred.'"  <u>See</u> <u>Marré v. United States</u>, 38 F.3d 823, 829 (5th Cir. 1994) (quoting 42 U.S.C. § 1988).  For instance, most civil rights statutes contain fee-shifting provisions that award "reasonable attorney's fees," such that "the prevailing party <u>may</u> recover for the reasonable value of the legal services, whether or not the winner has an obligation to pay the lawyer that sum."  <u>Neal v. Honeywell, Inc.</u>, 191 F.3d 827, 833 (7th Cir. 1999).  This principle makes sense in the unique civil rights context, where "the intention of Congress was to encourage successful civil rights litigation, not to create a special incentive to prove damages and shortchange efforts to seek effective injunctive or declaratory relief."  <u>Blanchard</u>, 489 U.S. at 95.

But in other contexts, "fee-shifting statutes are explicit about limiting recoveries to actual outlays" through the inclusion of the "incurred" language. Neal, 191 F.3d at 833. In those contexts, courts have concluded that fees may be awarded only if the plaintiff has actually incurred them—in other words, if plaintiff has "any legal obligation to pay his attorney . . . either by operation of the fee arrangement between them or otherwise." United States v. 122.00 Acres of Land, 856 F.2d 56, 58 (8th Cir. 1988); see also Estate of Palumbo v. United States, 675 F.3d 234, 239 (3d Cir. 2012) (noting that where statute "states only reasonable fees 'paid or incurred' . . . are reimbursable," a "party must actually incur the costs"); Andre v. City of West Sacramento, 92 Cal. App. 4th 532, 538–39 (Cal. App. Ct. 2001) ("Under the unambiguous terms of [the relevant statute], plaintiff was entitled to an award of attorney fees only for fees actually incurred, and then only to the extent they were reasonable."). And when a contingency fee agreement is involved, any attorney's fee award is capped at whatever the plaintiff will actually be legally obligated to pay his or her attorney. See, e.g., United States v. Claro, 579 F.3d 452, 462 (5th Cir. 2009) (noting that "contingent-fee agreements . . . provide a cap above which plaintiffs cannot recover"); Marré, 38 F.3d at 829 ("Because [the statute] limits attorney's fees to those actually incurred, [plaintiff] is entitled only to the amount owed under the contingency fee agreement plus costs, to the extent reasonable."); TGS Int'l, Inc. v. United States, 983 F.2d 229, 230 (Fed. Cir. 1993) (rejecting calculation of attorney's fees "based on attorney time actually expended" where the "fee arrangement was for an initial retainer paid to the attorney, plus a contingent fee to be based upon actual recovery"); Estate of Russell v. Commissioner, 1998 WL 852974, at *2 (U.S. Tax Ct. 1998) ("An award of attorney's fees should not be in excess of the fees agreed to by the taxpayer and his attorney and actually paid or incurred by the taxpayer.").

Although there is not an actual statute at issue here, the limited Maryland exception as articulated by the Maryland Court of Appeals undoubtedly includes the critical "incurred" language that courts have deemed determinative. See Cohen, 258 A.2d at 239 ("We hold [the insurer] bound to pay the fees incurred by [the insured] in bringing the declaratory judgment action to establish that [the insurer] had not done that which it had agreed with her to do." (emphasis added)); Nolt, 617 A.2d at 584 ("[T]he insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation" (emphasis added)); see also Charter Oak Fire Co. v. Am. Capital, Ltd., 2017 WL 3315306, at *22 n.21 (D. Md. Aug. 3, 2017) (noting that "[u]nder Maryland law, an insured . . . is entitled to recover attorney fees incurred in seeking coverage from an insurer that has breached its contractual duty to defend" (emphasis added)). Therefore, while Feld is entitled to attorney's fees under the Maryland exception, the Court concludes that those fees must be capped at the amount he has actually incurred under his contingency fee agreement.[5] And although those fees must still be "reasonable," the Court retains discretion only to "reduce [the contingent amount] to one that is reasonable," Claro, 579 F.3d at 462—it cannot increase the fees above the cap, cf. United States v. Adkinson, 256 F. Supp. 2d 1297, 1318 (N.D. Fl. 2003) (holding that, even though "[i]t is regrettable that [counsel] struck such a bad bargain in agreeing to represent [plaintiff] for a flat fee of $50,000, in what turned out to be an extremely complicated case," plaintiff was not "entitled to anything more than the $50,000 he incurred").

This Court, then, must evaluate how much Feld is obligated to pay Fulbright upon issuance of this decision, given the primary purpose of the Maryland exception to make Feld "whole," or (in other words) to put Feld "in as good a position as [he] would have occupied had [FFIC]

---

[5] Although Feld cites several cases for the proposition that fees are not restricted to amounts "incurred," see Feld Contingency Br. at 9–10, or for the proposition that it "is improper to award attorney's fees based on a contingency fee agreement without an assessment of the time and labor expended," see id. at 10, all of those cases were in the context of fee-shifting statutes that did not include the word "incurred" and are thus inapplicable.

performed its contractual obligation." Selective Way, 219 A.3d at 60 (internal quotation marks omitted).

As noted, given prior events in this litigation, under the fee agreement Feld is required to pay Fulbright 40% of the Gross Recovery obtained "on account of any or all of the Client Claims." Fee Agreement at 2. The Court interprets "Client Claims" as meaning the actual counts brought in Feld's Complaint against FFIC: Count 1—breach of contract, Count 2—breach of implied covenant of good faith and fair dealing, and Count 3—declaratory judgment.[6] See Compl. at 25–28. The Court has awarded Feld $2,224,121.61 for fees in the Underlying Litigation under Count 1. And there is no question that Feld has "actually incurred" all of those fees—indeed, he has already paid Fulbright for the Underlying Litigation. See Tr. of Mot. Hrg. [ECF No. 172] at 113:12–15 ("Mr. Feld has paid all of these bills. Yeah."). Any award from the Court must ensure that Feld retains that amount of fees, so that—consistent with the purpose of the Maryland exception—he will be made whole with respect to the Underlying Litigation. If the fee agreement defined "Gross Recovery" as being nothing more than the recovery obtained "on account of any or all of the Client Claims," the Court would simply calculate 40% of the Underlying Litigation award, which comes out to $889,648.64, evaluate whether that amount was reasonable, and that would be the end of it for the Fee Litigation award.

However, the fee agreement does not stop there. It goes on to state that "[i]n the event a court orders payment of attorneys' fees . . . in the [Fee Litigation], the amount of those attorneys'

---

[6] Any argument by Feld that its request for attorney's fees in the Fee Litigation (or its request for Fee Litigation expenses) is itself a "Client Claim" would be unavailing. The D.C. Circuit has emphasized in a related context that an interest in attorney's fees is not a standalone claim where it is a "mere byproduct of the suit." See Liu v. INS, 274 F.3d 533, 536 (D.C. Cir. 2001) (citing Wash. Hosp. Ctr. Nat'l Rehabilitation Hosp. v. Collier, 947 F.2d 1498, 1502 (D.C. Cir. 1991); see also id. at 536 ("[A]n interest in attorney's fees 'is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.'" (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 480 (1990)); Budinich v. Becton Dickinson & Co., 486 U.S. 196, 200 (1988) ("As a general matter, at least, we think it indisputable that a claim for attorney's fees is not part of the merits of the action to which the fees pertain. Such an award does not remedy the injury giving rise to the action.").

fees which are collected shall be included in the 'Gross Recovery' for purposes of calculating the percentage fee payable to [Fulbright]." Fee Agreement at 2. This somewhat odd provision means that Feld will owe Fulbright not just 40% of the roughly $2.2 million that the Court has awarded for the Underlying Litigation, but also 40% of the Court's eventual fee award for the Fee Litigation. This creates an arithmetic challenge for the Court, because if it simply awarded Feld the $2,224,121.61 plus 40%, for a total of $3,113,770.25, Feld would then owe Fulbright 40% of that total, or $1,245,508.10. That would bring the amount Feld was entitled to keep down to $1,868,262.15. He would therefore retain significantly less than the amount the Court has determined would make him whole for the Underlying Litigation.

In order to solve this puzzle, the Court must instead calculate Feld's Fee Litigation award such that it constitutes 40% of the total amount awarded to Feld by the Court as fees.[7] This calculation ensures that, under the terms of the contingency fee agreement, Feld can keep the full $2,224,121.61 in fees associated with the Underlying Litigation. The Court has done the math and determined that the total fees award should be $3,706,869.35. Only for that amount does the calculation work out such that of that total, 60% of it ($2,224,121.61) is Feld's free and clear to make him whole for the Underlying Litigation, while 40% of it represents the amount in fees that he actually "incurred" in the Fee Litigation ($1,482,747.74) and has a legal obligation to pay to Fulbright under the contingency fee agreement.

Now that the Court has calculated the amount of fees that Feld has actually incurred in the Fee Litigation, it notes that the calculated amount of $1,482,747.74 is about $1 million less than Feld's requested award of $2,482,895.59. Nonetheless, the Court must still evaluate whether that reduced amount is reasonable, keeping in mind that the Court "retains discretion [only] to reduce

---

[7] Put another way, the Court must calculate the number that $2,224,121.61 is 60% of, by dividing $2,224,121.61 by 0.6.

that amount to one that is reasonable," in light of the cap imposed by the contingency fee agreement. Claro, 579 F.3d at 462; see Selective Way, 219 A.3d at 59 (noting that fees awarded under the Maryland exception must be "reasonable"). To do so, it evaluates the award under the MLRPC factors.

First, as to rates, just as with the Underlying Litigation, the primary dispute between Feld and FFIC is over whether the Fee Litigation is "complex federal litigation." And, just as with the Underlying Litigation, the Court concludes that this is in fact complex federal litigation. The case has lasted for more than seven years, during which there were three years of contentious discovery (including lengthy privilege disputes that culminated in this Court sanctioning FFIC), nine witness depositions, extensive motions practice, a trip to the D.C. Circuit, several pretrial disputes, and a four-day trial. These elements of the case precisely match what courts in this Circuit have identified as making a case "complex." See, e.g., Reed, 843 F.3d at 525 (noting that presence of "extensive" discovery makes case more complex); Merrick, 134 F. Supp. 3d at 339 (noting that "complex federal litigation" usually involves procedural complexity); Snead, 139 F. Supp. 3d at 380 (suggesting that the presence of formal discovery, multiple hearings, and extensive motions practice makes a case complex); Spanski Enters. v. Telewizja Polska S.A., 278 F. Supp. 3d 210, 219 (D.D.C. 2017) (concluding that case was complex in part because it involved complicated discovery issues "over a period of years").

Because the case is complex federal litigation, the Laffey Matrix is once again applicable. And, as before, there is some fluctuation between 2012–2019 as to whether Fulbright's attorneys were above or below the Laffey rates—in some years, some attorneys were modestly above the Laffey rates and some below, and in other years none were above and some were below. See Ex. 6, Kirtland Decl. [ECF No. 158-6]. But overall, Fulbright adhered fairly closely to the Laffey

rates. As a "starting point," <u>DL</u>, 924 F.3d at 589, then, the Laffey Matrix generally supports the reasonableness of Fulbright's rates. Moreover, even if the Court were to reduce all the attorney rates that came in above Laffey to match the Laffey rates, the Court calculates that the total fee reduction would be only about $76,000. Given that the Court has already reduced the requested award by about $1 million in light of the contingency fee agreement, no further reduction is justified based on the Laffey Matrix.

To briefly address the remaining MLRPC factors: the Fulbright attorneys representing Feld would "likely have been fully engaged in similarly compensated work for other clients" if not assigned to the Fee Litigation, Kirtland Decl. ¶ 37; the Court has awarded Feld about two-thirds of what he sought (in fees and prejudgment interest) in the Underlying Litigation, so Fulbright has achieved modest, but not spectacular, success; Fulbright has a long history of representing Feld, Simpson Decl. ¶ 15; and the lawyers assigned to the case generally had experience in complex civil litigation, <u>see</u> Kirtland Decl. ¶¶ 44, 68, 76. Each of these factors weighs in favor of the reasonableness of Fulbright's rates and the Court concludes that it should make no further reduction to the award based on the rates.

As for hours, Maryland law requires that the billings supporting an award be "as detailed as reasonably possible, so that the client, and any other person who might be called upon to pay the bill, will know with some precision what services have been performed." <u>Patient First Corp.</u>, 120 A.3d at 143 (quoting <u>Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank</u>, 929 A.2d 932, 957 (Md. 2007)). "The sufficiency of the evidence presented as to attorneys' fees must be more than simply the number of hours worked, but less than a line by line analysis of services rendered." <u>Royal Inv. Grp., LLC v. Wang</u>, 961 A.2d 665, 696 (Md. Ct. Spec. App. 2008). The Court has reviewed Feld's filings and concludes that they meet this standard. Feld has provided 104 pages

of invoices reflecting the hours worked by each Fulbright attorney, as well as descriptions of the tasks performed in "sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended." Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C. Cir. 2004). Although FFIC challenges some of these hours as unreasonable, the Court rejects most of these challenges as either lacking any basis or being insufficiently supported. For instance, FFIC argues that the time spent by Fulbright attorneys drafting a motion for reconsideration of the Court's September 2016 opinion should be deemed unreasonable because this Court rejected all the arguments therein. FFIC Opp'n at 64. However, the D.C. Circuit vacated this Court's decision based upon one of the arguments made in that motion. Clearly the time spent developing those arguments was not unreasonable. Nor does FFIC justify its assertions that Fulbright recorded excessive time on discovery matters, see FFIC Opp'n at 66–67, or that Fulbright consistently recorded time for clerical or paralegal work, see FFIC Opp'n at 63–64.

Furthermore, even if the Court accepted all of FFIC's many challenges to the hours recorded by Fulbright (to the extent that FFIC has actually quantified them), the total reduction to Feld's requested award would amount to only about $400,000. The Court's independent calculation, based not on reasonable hours times reasonable rates but instead on the contingency fee agreement, has already reduced the Fee Litigation award by significantly more than that amount—approximately $1 million.[8] No further reduction is justified.

---

[8] The Court notes that the fee agreement excludes time spent prosecuting or defending any appeals, see Fee Agreement at 1, but that Fulbright's hours spent on the appeal in this case are included in its initial request. The Court has determined that the time spent on the appeal was worth, at most, about $250,000. Excluding that amount would still not reduce the award beyond the $1 million that the fee award has already been reduced.

## B. Litigation Expenses

The Court now comes to the final question in this case: whether Feld is entitled to reasonable expenses in the Fee Litigation. Maryland law provides that when an insured is entitled to fees under Maryland's exception to the American rule, the insured is also entitled to expenses, so long as the insured supports the request with adequate documentation. See <u>Nolt</u>, 617 A.2d at 584–85. As the Court concluded above, the Maryland exception does entitle Feld to fees. Therefore, he is also entitled to expenses.

As for documentation, an insured must submit "invoices and spreadsheets detailing the fees and expenses incurred." <u>Comm. Union Ins. Co.</u>, 698 A.2d at 703–04 (noting that where a party submits such documentation, it has "eminently satisfied [the relevant] rigorous standards of proof"). Here, Feld has provided a breakdown of his expenses, such as copying and printing charges, court fees, and legal research costs. Rate Agreement Litigation Expenses [ECF No. 158-17]. His documentation contains adequate descriptions of the $115,783.56 in expenses, as well as the dates on which they were incurred.

The contingency fee agreement notes that Feld is responsible in full for all "other services and expenses," which includes the types of expenses he is seeking here, like "charges for computer research" and "photocopying and other reproduction charges." Fee Agreement at 2. As such, he has actually incurred all of the expenses, as required under the Maryland exception. See <u>Nolt</u>, 617 A.2d at 584 (stating that "the insured is entitled to recovery of the attorneys' fees <u>and expenses incurred</u>" (emphasis added)). Hence, the Court will award Feld the requested $115,783.56 in expenses for the Fee Litigation.[9]

---

[9] Because, as the Court has determined, "Client Claims" in the fee agreement means the three counts asserted in Feld's complaint, and does not include his request for attorney's fees or expenses in the Fee Litigation, there is no need to include this expenses amount in the Gross Recovery or to be concerned that Feld will have to pay 40% of it back to Fulbright.

**Conclusion**

For the foregoing reasons, the Court will award Feld $3,822,652.91, which consists of (1) $2,224,121.61 in fees for the Underlying Litigation; (2) $1,482,747.74 in fees for the Fee Litigation; and (3) $115,783.56 in expenses for the Fee Litigation.  The Court will also award Feld post-judgment interest under 28 U.S.C. § 1961.  A separate order will be issued on this date.


/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>March 9, 2020</u>